**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| JEFF DILLON and<br>DILLON TRANSPORT, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | 2017L012751<br>CALENDAR/ROOM X<br>TIME 00:00<br>Legal Malpractice |
| | ) | |
| vs. | ) | No.: |
| | ) | |
| TANNEN LAW GROUP, P.C., | ) | |
| MICHAEL TANNEN, NATHAN, HOWELL, | ) | |
| SMITH & LEE LLC and LARRY D. WARREN, | ) | **Plaintiffs demand trial by jury** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| Respondent in Discovery, | ) | |
| | ) | |
| GREAT WEST CASUALTY COMPANY | ) | |

**COMPLAINT AT LAW**

**COUNTS I, II, III & IV**

**TANNEN LAW GROUP, P.C. and MICHAEL TANNEN**
**(Professional Negligence)**

NOW COME the Plaintiffs, JEFF DILLON and DILLON TRANSPORT, INC. by and through their attorney, BARRY G. BOLLINGER, and state the following as their Complaint at Law against the Defendants, TANNEN LAW GROUP, P.C. and MICHAEL TANNEN:

1.     At all relevant times, the Plaintiffs, JEFF DILLON and DILLON TRANSPORT INC., were residents of Cook County, Illinois.

2.     At all relevant times, the Defendant, TANNEN LAW GROUP P.C., was an Illinois professional corporation located and doing business in Cook County, Chicago, Illinois, who, by its partner, agent, servant and/or employee, MICHAEL TANNEN, provided legal counsel and representation to JEFF DILLON and DILLON TRANSPORT, INC.

3.     As Cook County is the residence of the defendants TANNEN LAW GROUP, P.C.

EXHIBIT A

and MICHAEL TANNEN and the transactions that occurred here gave rise to this cause of action, venue is appropriate pursuant to 735 ILCS 5/2-101(1)(2).

4.      At all relevant times, the Defendant, MICHAEL TANNEN, was an attorney licensed to practice law in the State of Illinois.

5.      At all relevant times, the Defendant, MICHAEL TANNEN, was a real or apparent agent, partner, servant and/or employee of the Defendant, TANNEN LAW GROUP P.C. and was operating within the scope of his employment when he provided legal counsel and representation to JEFF DILLON and DILLON TRANSPORT, INC.

6.      In April 2013 and before, DILLON TRANSPORT, INC. was a named as a defendant in a commercial trucking case, involving severe personal injuries that was voluntarily dismissed twice and then re-filed in a different venue, Nueces County, Texas with cause number 2015 DCV-0235-B.

7.      In the prior two cases and in the re-filed case, 2015 DCV-0235-B, DILLON TRANSPORT, INC. was represented, up to the extent of its $5,000,000 liability insurance policies, by Texas attorney Larry Warren of Naman Howell Smith & Lee, PLLC.

8.      In September 2015 and before, DILLON TRANSPORT, INC. in cause number 2015 DCV-0235-B was alleged to be liable for its own negligence and also vicariously liable for the negligent acts of its employee/ servant in operating a tractor tanker licensed in Illinois and bearing DILLION TRANSPORT, INC's motor carrier number and operated under its DOT motor carrier authority.

9.      In cause number 2015 DCV -0235 it was alleged that the negligence of DILLON TRANSPORT, INC. and the negligence of its employee/servant resulted in serious and permanent personal injuries to Theresa Gamez and Miguel A. Garcia Sr., including a below the knee leg

amputation, partial amputation of a hand, traumatic brain injuries, multiple fractures, disability, disfigurement, pain and physical suffering.

10. It was also alleged in cause number 2015 DCV -0235 that DILLON TRANSPORT, INC.'s negligence made it liable to Theresa Gamez and Miguel A. Garcia Sr. for their significant economic and pecuniary damages.

11.     On or about September 10, 2015 a detailed pre-trial and pre-mediation evaluation report regarding 2015 DCV -0235 was authored by Texas attorney Larry Warren of Naman Howell, Smith & Lee PLLC and sent by him to JEFF DILLON and DILLON TRANSPORT, INC. in Cook County, Illinois (see **Exhibit 1** attached which is incorporated herein by reference and made part of this complaint).

12.     Attorney Larry Warren's evaluation was that cause number 2015 DCV -0235 would be defensible at the trial scheduled to begin December 2015.

13.     According to Larry Warren's aforementioned detailed pre-trial and pre-mediation evaluation report of cause number 2015 DCV-0235, the injured parties together could "black board" $5,785,815.03 in hard economic damages involving past and future medical specials, past lost earnings, future loss of earning capacity and future care costs (see **Exhibit 1**, page five).

14.     On and before December 2015 JEFF DILLON and DILLON TRANSPORT, INC. and defendants, TANNEN LAW GROUP P.C. and MICHAEL TANNEN had a pre-existing attorney client relationship.

15.     In December 2015 defendants TANNEN LAW GROUP P.C. and MICHAEL TANNEN were contacted and retained by JEFF DILLON and DILLON TRANSPORT, INC. before a jury verdict was rendered, to review cause number 2015 DCV -0235, and to advise them of their personal exposure and the risk above their $5,000,000 liability insurance policy limits and,

3

if required, to take action to protect them against an adverse verdict.

16.      Defendant, TANNEN LAW GROUP P.C., acting by and through its agent, partner, servant and/or employee MICHAEL TANNEN reviewed records and documents from cause number 2015 number DCV -0235.

17.      Thereafter, MICHAEL TANNEN in Cook County was contacted multiple times by telephone and through e-mails initiated by Texas attorney Larry Warren of Naman Howell Smith & Lee PLLC., who represented DILLON TRANSPORT, INC. at trial in cause number 2015 DCV-0235-B.

18.      Had timely negotiations occurred before trial or during the trial the attorneys for Theresa Gamez and Miguel A. Garcia Sr. would have settled cause number 2015 number DCV-0235 within DILLON TRANSPORT, INC's $5,000,000 liability insurance limits.

19.      On December 18, 2015, in cause number 2015 DCV-0235-B a Nueces County, Texas jury returned a $32 million verdict against defendant DILLON TRANSPORT, INC.

20.      Thereafter Defendant MICHAEL TANNEN in Cook County and Texas attorney Larry Warren engaged in additional telephone calls and exchanged multiple e-mails.

21.      After December 18, 2015, DILLON TRANSPORT, INC. in case number 2015 DCV-0235-B engaged in a 50,000-page financial disclosure regarding its corporate assets. Later negotiations with the personal injury plaintiffs resulted in a settlement on December 19, 2016, involving JEFF DILLON'S and DILLON TRANSPORT INC.'S personal assets.

22.      As part of this settlement, JEFF DILLON and DILLON TRANSPORT, INC., in order to save the trucking company from the financially ruinous $32 million judgement, were forced to pay $2,500,000 in personal monies above the limits of DILLON TRANSPORT'S $5,000,000 liability insurance policy limits. However, JEFF DILLON and DILLON

TRANSPORT, INC. suffered losses much greater than $2,500,000. as a result of the $32 million verdict and settlement.

23.     It was the duty of the defendants, TANNEN LAW GROUP P.C. acting through its employee, agent and servant MICHAEL TANNEN to provide legal counsel and legal representation that was free of negligence to JEFF DILLON and DILLON TRANSPORT, INC. in December 2015, and continuing; yet, notwithstanding this duty, each of these defendants:

i)      Negligently failed to issue timely pre-verdict written letters demanding that cause 2015 DCV -0235 be settled within the applicable liability insurance policy limits of $5,000,000;

ii)     Negligently failed to initiate timely pre- verdict settlement negotiations in cause number 2015 DCV -0235; and

iii)    Negligently failed to timely advise his clients of the likelihood of a ruinous adverse verdict in cause number 2015 DCV -0235 and the steps they should have taken to protect themselves.

24.     One or more of the aforementioned negligent acts or omissions by the defendants TANNEN LAW GROUP P.C., acting through its employee, agent/ servant MICHAEL TANNEN, caused or contributed to cause JEFF DILLON and DILLON TRANSPORT, INC. to suffer losses of a pecuniary nature, including, but not limited to, the personal monies expended to settle cause number 2015 DCV -0235.

25.     TANNEN LAW GROUP P.C. is vicariously responsible for all negligent acts committed within the scope his employment by its partner, employee, agent and servant MICHAEL TANNEN.

26.     In Count I Plaintiff JEFF DILLON seeks all legally recoverable damages against defendant TANNEN LAW GROUP P.C.

27.     In Count II Plaintiff JEFF DILLON seeks all legally recoverable damages against

defendant MICHAEL TANNEN.

28.     In Count III Plaintiff DILLON TRANSPORT, INC. seeks all legally recoverable damages against defendant TANNEN LAW GROUP P.C.

29.     In Count IV Plaintiff DILLON TRANSPORT, INC. seeks all legally recoverable damages against defendant MICHAEL TANNEN.

**WHEREFORE**, plaintiffs, JEFF DILLON and DILLON TRANSPORT, INC. respectfully request that judgment be entered in their favor and against the defendants, TANNEN LAW GROUP P.C. and MICHAEL TANNEN, for the negligent acts of the institution, and its employee or agent, in an amount that will fully and fairly compensate the plaintiffs for all of their losses. Pursuant to 735 ILCS 5/2-604 the amount of compensatory damages cannot be stated; however, the damages substantially exceed all applicable and minimal jurisdictional amounts.

## COUNTS V, VI, VII & VIII

### NAMAN HOWELL, SMITH & LEE PLLC and LARRY WARREN
### (Professional Negligence – Breach of Fiduciary Duty)

NOW COME the Plaintiffs, JEFF DILLON and DILLON TRANSPORT, INC. by and through their attorneys, BOLLINGER, CONNELLY & KRAUSE and state the following as their Complaint at Law against the Defendants NAMAN HOWELL, SMITH & LEE PLLC and LARRY WARREN:

1.     At all relevant times, the Plaintiffs, JEFF DILLON and DILLON TRANSPORT INC., were residents of Cook County, Illinois.

2.     At all relevant times, the Defendant, NAMAN HOWELL, SMITH & LEE PLLC was an Texas professional corporation located in San Antonio, Texas, which by its attorney, partner, agent, servant and/or employee, LARRY WARREN, also a Texas resident, initiated an

attorney-client relationship with and provided legal counsel and representation to JEFF DILLON and DILLON TRANSPORT, INC., from April 2013 into 2016 in three related personal injury lawsuits filed against DILLON TRANSPORT, INC. in Texas.

3.      At all relevant times, the Defendant, LARRY WARREN, was a real or apparent agent, partner, servant and/or employee of the Defendant, NAMAN HOWELL, SMITH & LEE PLLC and was operating within the scope of his employment when he provided legal counsel and representation to JEFF DILLON and DILLON TRANSPORT, INC. from 2013- 2016.

**Venue**

4.      The transaction, or some part of the transaction, occurred here in Cook County which gave rise to this cause of action against Defendants, NAMAN HOWELL, SMITH & LEE PLLC and LARRY WARREN for legal malpractice/ breach of fiduciary duty, making venue in Cook County appropriate pursuant to 735 ILCS 5/2-101(2).

**Jurisdiction- Illinois Long Arm Statute 5/2-209**

5.      From April 2013 through 2016 the Defendant's, NAMAN HOWELL, SMITH & LEE PLLC, acting through its servant LARRY WARREN, had repeated business contacts with Illinois by making multiple telephone calls, participating in telephone conference calls, giving legal advice, sending emails and snail mailing correspondence, work product case update reports and detailed pre-trial case evaluations directed to JEFF DILLON and DILLON TRANSPORT, INC. in Cook County.

6.      NAMAN HOWELL, SMITH & LEE PLLC is a corporation incorporated under the laws of the State of Texas, having its principle place of business in Texas, and through the purposeful conduct of its attorneys, partners, employees or agents, including LARRY WARREN, referenced in paragraph #5 above, is subject to the Illinois long arm statute 735 ILCS 5/2-

7

209(a)(1)(2)(7)(11) and ( c ).

7.    At all relevant times, the Defendant, LARRY WARREN, was an attorney licensed to practice law in the State of Texas and through his actions and purposeful conduct, referenced in paragraph #5 above, is subject to the Illinois long arm statute 735 ILCS 5/2-209(a)(1)(2)(7)(11) and ( c ).

**Defendant's Minimum contacts with Illinois**

8.    Both Defendant's NAMAN HOWELL, SMITH & LEE PLLC and LARRY WARREN have "minimum contacts" with Illinois through their business contacts, communications and conduct in initiating multiple phone calls, participating in telephone conference calls, giving legal advice, sending e-mails and snail mailing correspondence, work product case update reports, pre-trial case evaluations and in 2017 sending copies of the defense file directed to JEFF DILLON and DILLON TRANSPORT, INC. in Cook County.

9.    Moreover, Defendant's, NAMAN HOWELL, SMITH & LEE PLLC and LARRY WARREN derived financial benefits from their business contacts with Illinois and the continuing relationships and obligations involving Illinois residents JEFF DILLON and DILLON TRANSPORT, INC.

10.    It is the nature and quality of the Defendants communications with JEFF DILLON and DILLON TRANSPORT, INC. and others in Cook County that gave rise to the cause of action herein complained of.

**Related Texas Lawsuits**

11.    In April 2013 and before, DILLON TRANSPORT, INC. was a named as a defendant in three lawsuits, involving severe personal injuries.  Two of the lawsuits filed in San Patricio County, Texas were voluntarily dismissed by the plaintiff.  A third lawsuit, with a different

prosecution strategy, was re-filed against DILLON TRANSPORT, INC. in a different venue, Nueces County, Texas under cause number 2015 DCV-0235-B.

12.     In all three related lawsuits DILLON TRANSPORT, INC. was represented by Defendants LARRY WARREN and NAMAN HOWELL, SMITH & LEE PLLC up to the extent of the trucking company's $5,000,000 liability insurance coverage.

13.     In September 2015 and before, DILLON TRANSPORT, INC. in cause number 2015 DCV-0235-B was alleged to be liable for its own negligence and also vicariously liable for the negligent acts of its employee/ servant in operating a tractor tanker licensed in Illinois and bearing DILLON TRANSPORT, INC's motor carrier number and operated under its DOT motor carrier authority.

14.     In cause number 2015 DCV -0235 it was alleged that the negligence of DILLON TRANSPORT, INC. and the negligence of its employee/servant resulted in serious and permanent personal injuries to Theresa Gamez and Miguel A. Garcia Sr., including a below the knee leg amputation, a partial amputation of a hand, traumatic brain injuries, multiple fractures, disability, disfigurement, pain and physical suffering.

15.     It was also alleged in cause number 2015 DCV -0235 that DILLON TRANSPORT, INC.'s negligence made it liable to Theresa Gamez and Miguel A. Garcia Sr. for their significant economic losses and pecuniary damages.

**Pre-trial and Pre- mediation case evaluation report**

16.     On or about *September 10, 2015* a detailed pre-trial and pre-mediation evaluation report regarding 2015 DCV -0235 was authored by Defendant LARRY WARREN and sent by him to JEFF DILLON and DILLON TRANSPORT, INC. in Cook County, Illinois (see **Exhibit 1** attached, which is incorporated herein by reference and made part of this complaint).

9

17.     Attorney LARRY WARREN's evaluation was that cause number 2015 DCV-0235 would be defensible at the trial scheduled to begin December 1, 2015. JEFF DILLON and DILLON TRANSPORT, INC. and the Respondents in Discovery relied upon the accuracy of these reports.  Based on this and prior evaluation reports authored by LARRY WARREN, the excess carrier, AIG - Lexington, did not place a reserve on its claims file.

18.     The defense of this case centered around the favorable testimony of accident reconstructionist Texas Trooper Cody Lankford who investigated the collision and the two "eyewitnesses" who supposedly saw it.

19.     According to LARRY WARREN's September 10, 2015 pre-trial and pre-mediation evaluation report, the injured plaintiff's, Garcia and Gomez, together could "black board" $5,785,815.03 in hard economic damages involving past and future medical specials, past lost earnings, future loss of earning capacity and future care costs (see **Exhibit 1**, page five).

20.     On *October 9, 2015* cause number 2015 DCV-0235 was mediated with the defense team lead by LARRY WARREN making no serious offers of settlement and walking out of the mediation.  At that mediation the attorney for the injured plaintiffs had demanded $15 million, but was willing to participate in serious settlement negotiations. Plaintiff's would have at this point settled the case within DILLON TRANSPORT, INC.'s $5 million policy limits.

**Amended complaints filed with allegations of Gross Negligence**

21.     On *October 16, 2015* the attorneys for the injured plaintiffs in cause number 2015 DCV-0235 with leave of court, amended their complaints to include allegations of gross institutional negligence against DILLON TRANSPORT, INC.

**Critical defense witness barred from testifying at trial**

22.     On *November 18, 2015* the trial judge in cause number 2015 DCV-0235 conducted a lengthy evidentiary hearing and then granted plaintiff's motion to bar the testimony of defense witness Texas Trooper Cody Lankford.

23.     The legal team defending DILLON TRANSPORT, INC. had previously considered Trooper Cody Lankford to be a "*strong and credible witness for the defense*". Trooper Lankford was trained in accident reconstruction and had expressed very favorable opinions for the defense on the point of impact. It was Trooper Lankford's ultimate opinion that the motorcycle had crossed the yellow dividing line and into the lane of travel of oncoming traffic, before striking the DILLON TRANSPORT, INC. tanker, which was traveling within its proper lane.

24.     However, the trial judge found Trooper Lankford's report and his testimony to be "unreliable". Moreover, a police dash cam video showed that Trooper Lankford had moved the downed motorcycle closer to the double yellow lines at the accident scene and then marked the new position of rest on the roadway with paint. The newly created place of rest for the motorcycle was reflected in his police report.

**Trial -December 2, 2015- December 16, 2015**

25.     On December 2, 2015 the expected two-week trial of 2015 DCV-0235 began. The trial did not go as planned for the defense. The plaintiff's case made inroads from the beginning prosecuting DILLON TRANSPORT, INC. on its recently filed gross negligence count. During trial Kenneth Jennings, the defendant truck driver employed by DILLON TRANSPORT, INC. cried on the witness stand and essentially apologized for causing the accident. The two plaintiffs testified at trial that the DILLON TRANSPORT, INC. tanker was over the yellow line and into their lane of travel causing a loss of control of the motorcycle and the collision.

26.     The two "supportive "defense eye witnesses were called by the plaintiff's in their case in chief and did not support the defense. The plaintiff's case at trial used its retained trucking expert witness Roger Allen, to focus their liability case on the failure of DILLON TRANSPORT INC.'s safety culture. The testimony of the plaintiff's damages witnesses and treating physicians' testimony went in well. The defense case began on December 14 and rested the next day December 15, 2015 and evidence was closed. During trial, no further offers of settlement were made by the defense or recommended by LARRY WARREN.

27.     On December 16, 2015 the jury was charged, closing arguments were made and the jury was given the case. Later the jury had questions which showed they were clearly leaning towards bringing back a significant plaintiff's verdict.

28.     On December 17, 2015 at 7 am central time LARRY WARREN called JEFF DILLON at DILLON TRANSPORT INC.'s home office in Cook County. The purpose of this conference call was to review the import of the jury's questions and to try to develop a strategy to settle the case.

29.     DILLON TRANSPORT INC.'s combined $5,000,000 policies were available later in the day on December 17, 2015; however, at this late juncture, the plaintiff's attorneys were not interested in settling the case for insurance policy limits "having come this far". Instead the plaintiff's attorneys proposed a "$4.9 - $15 million "high - low" agreement.

**$32,664,718 Jury Verdict**

30.    On December 18, 2015 the jury returned a $32,664,718 verdict for the plaintiff's and against DILLON TRANSPORT, INC. and its employee. The jury allocated fault: 20 % Garcia (motorcyclist), 0% Gamez - by law, 20% Kenneth Jenning's the truck driver and 60% on DILLON TRANSPORT, INC., for its direct negligence in having a deficient safety culture. (Signed Jury

Verdict form attached as **Exhibit 2** and incorporated by reference herein as part of this complaint.)

31.  The defendants, NAMAN HOWELL, SMITH & LEE PLLC acting through its employee, agent and servant LARRY WARREN had a fiduciary duty to provide legal counsel and legal representation that was free of negligence to JEFF DILLON and DILLON TRANSPORT, INC. beginning in April 2013, and continuing through to 2016; yet, notwithstanding this duty, each of these defendants:

    i)    Negligently failed to properly evaluate their defense case;

    ii)    Negligently failed to re- evaluate the defense of their case after Trooper Cody Lankford was barred by the trial judge on November 18, 2015;

    iii)    Negligently failed to recommend participation in settlement negotiations after the change in posture of the case with the loss of critical defense witness Trooper Cody Lankford;

    iv)    Failing to recognize the impact the gross negligence allegations would have on the jury's allocation of fault

    v)    Negligently failed to recommend participation in settlement negotiations during trial when settlement within policy limits was still likely;

    vi)    Negligently failed to timely recommend and advise their clients JEFF DILLON and DILLON TRANSPORT, INC. that they had the right to retain personal counsel to advise them of the potential in this case of an excess verdict and the risk of exposure of their personal assets; and

    vii)    Negligently failing to keep their clients properly advised of the true posture of the three cases.

32.  NAMAN HOWELL, SMITH & LEE PLLC is vicariously responsible for all negligent acts committed within the scope his employment by its partner, employee, agent and servant LARRY WARREN.

33.  After December 18, 2015, DILLON TRANSPORT, INC. in case number 2015 DCV-0235-B engaged in a 50,000-page financial disclosure regarding its corporate assets. Later

negotiations with the personal injury plaintiffs resulted in a settlement on December 19, 2016, involving JEFF DILLON'S and DILLON TRANSPORT INC.'S personal assets.

34.     As part of this settlement, JEFF DILLON and DILLON TRANSPORT, INC., in order to save the trucking company from the financially ruinous $32 million judgement, were forced to pay $2,500,000 in personal monies above the limits of DILLON TRANSPORT INC.s $5,000,000 liability insurance policy limits. However, JEFF DILLON and DILLON TRANSPORT, INC'S suffered losses much greater than $2,500,000. as a result of the $32 million verdict and subsequent settlement.

35.     In Count V Plaintiff JEFF DILLON seeks all legally recoverable damages against defendant NAMAN HOWELL, SMITH & LEE, PLLC.

36.     In Count VI Plaintiff JEFF DILLON seeks all legally recoverable damages against defendant LARRY WARREN.

37.     In Count VII Plaintiff DILLON TRANSPORT, INC. seeks all legally recoverable damages against defendant, NAMAN HOWELL, SMITH & LEE, PLLC.

38.     In Count VIII Plaintiff DILLON TRANSPORT, INC. seeks all legally recoverable damages against defendant LARRY WARREN.

**WHEREFORE**, plaintiffs, JEFF DILLON and DILLON TRANSPORT, INC. respectfully request that judgment be entered in their favor and against the defendants, NAMAN HOWELL, SMITH & LEE, PLLC and LARRY WARREN, for the negligent acts of the institution, and its employee or agent, in an amount that will fully and fairly compensate the plaintiffs for all of their losses. Pursuant to 735 ILCS 5/2-604 the amount of compensatory damages cannot be stated; however, the damages substantially exceed all applicable and minimal jurisdictional amounts.

14

**Plaintiffs demand trial by jury**

Respectfully submitted,

Barry G. Bollinger

Barry G. Bollinger
500 West Madison Street
Suite 2430
Chicago, Illinois 60661
Tel:     (312) 466-7200
E-mail: bbollinger@bollingertrials.com
Attorney No.: 0247952

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| JEFF DILLON and<br>DILLON TRANSPORT, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No.: |
| | ) | |
| TANNEN LAW GROUP, P.C.,<br>MICHAEL TANNEN, NATHAN, HOWELL,<br>SMITH & LEE LLC and LARRY D. WARREN, | ) | **Plaintiffs demand trial by jury** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| Respondent in Discovery, | ) | |
| | ) | |
| GREAT WEST CASUALTY COMPANY | ) | |

## AFFIDAVIT PURSUANT TO SUPREME COURT RULE 222(b)

Pursuant to Supreme Court Rule 222(b) counsel for the above-named Plaintiffs certify that Plaintiffs seek money damages in excess of $50,000.00.

Respectfully submitted,

Barry G. Bollinger. Attorney for the Plaintiffs

Barry G. Bollinger
500 West Madison Street
Suite 2430
Chicago, Illinois 60661
Tel:     (312) 466-7200
E-mail: bbollinger@bollingertrials.com
Attorney No.: 0247952

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| JEFF DILLON and<br>DILLON TRANSPORT, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No.: |
| | ) | |
| TANNEN LAW GROUP, P.C., | ) | |
| MICHAEL TANNEN, NATHAN, HOWELL, | ) | |
| SMITH & LEE LLC and LARRY D. WARREN, | ) | **Plaintiffs demand trial by jury** |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| | ) | |
| Respondent in Discovery, | ) | |
| | ) | |
| GREAT WEST CASUALTY COMPANY | ) | |

### JURY DEMAND

The undersigned demands a jury trial.

Respectfully submitted,

BY: _____
Barry G. Bollinger

Barry G. Bollinger
500 West Madison Street
Suite 2430
Chicago, Illinois 60661
Tel:      (312) 466-7200
E-mail: bbollinger@bollingertrials.com
Attorney No.: 0247952



## NAMANHOWELL
## SMITH&LEE PLLC
ATTORNEYS AT LAW

Larry D. Warren
Union Square II
10001 Reunion Place, Suite 600
San Antonio, Texas 78216
(210) 731-6360
Fax (210) 736-2960
lwarren@namanhowell.com

Offices in:
· Austin
· Fort Worth
· San Antonio
· Waco

www.namanhowell.com

September 10, 2015

k.pixley@gwccnet.com
Mr. Ken Pixley
Great West Casualty Company
624 Six Flags Drive, Suite 240
Arlington, Texas 76011

RE:     Claim #:          G15778
        Insured:          Dillon Transport, Inc.
        Claimant:         Miguel A. Garcia Sr. and Theresa Gamez
        DOL:              03/02/13
        NHSL File #:      97700-0026
        Mediation date:   October 9, 2015
        Trial date:       November 16, 2015

## PRE TRIAL AND PRE MEDIATION EVALUATION

Dear Ken:

Please accept the following as our Pre Trial and Pre Mediation Evaluation in the above-referenced matter.

I.     Occurrence Description

On March 2, 2013, Dillon Transport, Inc driver Kenneth Eugene Jennings was operating a 2013 Peterbilt tractor pulling a tanker trailer in San Patricio County, Texas. The accident took place at a curve on State Highway 188. Jennings was west bound on the two lane highway with a double yellow line separating the two lanes. The highway curved to Jennings left so he would be on the outside of the curve arc.

Miguel A. Garcia was riding a 1985 Honda Gold Wing motorcycle with passenger Theresa Gamez. Garcia and Gomez were eastbound and would be curving to their right with their lane being the inside lane of the curve arc.

DPS Trooper Samuel Lankford concluded his investigation with a finding that Garcia traveled over the yellow line and into our driver's lane striking the left side of our trailer just in front of the trailer tandems. Gouge marks in the pavement are supportive of Trooper Lankford's conclusions. These gouge marks start on the double yellow line at Jennings

{03556123.DOC / }



Mr. Ken Pixley
September 14, 2015
Page 2

side of the road and veer to the south and east back into Garcia's lane of travel. Equally important, the gouge marks actually indicate an area of impact just east of the curve or in an area of straight roadway just before our driver would be getting to the curve. Likewise, the gouge marks are in an area of the roadway which would occur just after Garcia would be coming out of the curve.

Supportive of the gouge mark location of the accident is eyewitness Randy Collins who was following our tractor trailer the morning of the accident and reported the following: Collins said that he was following our tractor trailer for several miles west bound on Highway 188. He stated that they were traveling approximately 55-60 MPH. The speed limit on that section of roadway is 55 MPH. Collins stated that the accident occurred just before our tractor trailer reached the curved portion of the roadway. Collins further reported that our tractor-trailer never crossed the yellow line and maintained his position in his lane of travel. Collins then observed an explosion of debris at the left rear of our trailer and saw the Honda Gold Wing traveling in the opposite direction wobbling and ultimately falling. He could not state if the Motorcycle crossed the center stripe because he did not see the motorcycle before the explosion. He is adamant that our trailer tires never crossed our solid yellow line.

Collins described the motorcycle then sliding on its side with the female passenger rolling to a stop near the area of impact and becoming unconscious. The male driver slid across the east bound lane of travel and directly in front of Collins. Collins took his car off the highway and onto the dirt shoulder. He brought his car to a stop and went to assist the female passenger of the motorcycle.

Further support that the accident happened as a result of the motorcycle crossing the double yellow line came from eye witness Charlie Teamann. Charlie was following the Garcia motorcycle on that Saturday and testified that he saw the motorcycle cross both solid yellow lines and into our lane striking the back of our trailer. He further testified that our tractor and trailer remained in its lane of travel throughout the entire curve.

Both motorcyclists were transported to the hospital from the scene. Mr. Garcia ultimately suffered a below the knee amputation of the left leg and amputation of the left pinky with significant left hand damage. Ms. Gamez suffered a closed head injury with unconsciousness and claims that she is not mentally there.

Our driver, Kenneth Jennings described the accident as occurring with the motorcycle drifting into Jennings lane and Jennings trying to move as far as he could to the right. There is no shoulder on this two lane highway.

II.    Critical Liability Issues

It appears that primary liability for the accident will be assigned to Mr. Garcia. With the DPS report, Collins' testimony, Teamann testimony, and scene gouge mark I believe

{03556123.DOC / }

Mr. Ken Pixley
September 14, 2015
Page 3

we have strong evidence supporting the fact that Garcia crossed the center stripe and into
our driver's lane of travel or at the very least crossed his wheels over his no passing stripe
which would place half of his bike encroaching on our lane of travel.

III.     **Critical Damage Issues**

Mr. Garcia ultimately suffered a below the knee amputation of the left leg and
amputation of the left pinky with significant left hand damage.   Ms. Gamez suffered a
closed head injury with unconsciousness and claims that she is not mentally there.

IV.     **Jurisdiction and Venue**

Jurisdiction is in the 117th Judicial District Court for Nueces County Texas with
Venue in Nueces County.  Jurisdiction is appropriate because our driver is a Texas citizen
and therefore removal to Federal Court is not an option.  Venue is appropriate in Nueces
County because Theresa Gamez sued her boyfriend/motorcycle operator Miguel Garcia.
Garcia is a resident of Nueces County.

V.     **Answer and Appearance**

We have filed a general denial on behalf of Dillon Transport and Kenneth Jennings.
We have pled an affirmative defense of contributory negligence against Mr. Garcia and
have filed a cross claim against him for his negligence in causing injury to Ms. Gamez.

VI.     **Opposing counsel**

Our opposing is Bill Edwards and his son Bill Edwards III.  Bill the elder is an
irascible older lawyer who likes to sink his teeth into an opponent and never let go.  His son
is more reserved but is an effective competent trial attorney. I fully expect a tough battle on
this case.  Miguel Garcia is represented by former medical mal practice defense attorney
Craig Smith.

VII.     **Expert Staffing**

We have retained the following experts.

1.  Dirk Smith – accident reconstruction. Dr. Smith is of the opinion that Garcia traveled
    across the center stripe and struck our trailer.  Throughout the accident sequence
    Jennings never left his lane of travel. In fact, Smith is of the opinion that the impact
    occurred before our trailer reached the curve and therefore the trailer would not
    have off tracked.  Most importantly, both our expert and plaintiff's expert state that
    there is no physical evidence on the roadway of the exact impact zone, so you have
    to defer to the eyewitnesses.

{03556123.DOC / }

Mr. Ken Pixley
September 14, 2015
Page 4

2. Andy Seivers – DOT. Seivers is of the opinion that it was proper for Dillon to have hired Jennings and that Jennings was properly trained. He is further of the opinion that it was proper for Jennings to have been driving on the narrow two lane Highway 188.

3. Dr. Michael Dennis – Neurology – Dr. Dennis has given opinions on both Garcia and Gamez. Dr. Dennis is of the opinion that Garcia certainly suffered the aforementioned amputations, but that Garcia's claim for Traumatic Brain Injury is exaggerated. Garcia had no loss of consciousness, no intracranial abnormalities and is mentally functioning at his pre accident level. In regard, to Ms. Gamez, Dr. Dennis is of the opinion that she suffered a mild traumatic brain injury with some short term loss of consciousness. He believes that any brain complications would have resolved in 6-12 weeks and that she is currently functioning at her pre accident level.

4. Dr. Francisco Perez – Neuropsychology – Dr. Perez is of the opinion that Ms. Gamez suffered a mild traumatic brain injury with subarachnoid hemorrhage. The hemorrhage resolved very quickly and her original Glasgow Coma Scale of 14 improved rapidly. Perez believes that Gamez recovered from her injuries and suffers no neurocognitive deficits. Dr. Perez advises that Garcia has no neurological complication and no traumatic brain injury. Instead he is of the opinion that, at most, Garcia suffers from psychological adjustments of depression and anxiety over the loss of his lower left leg and left pinkie.

Gamez and Garcia have retained the following experts:

1. Wade Bartlett – Accident reconstruction. He says the evidence is consistent with an overlap of the two vehicles but he never states who went left of center. Instead he focuses on the two eyewitnesses, Collins and Teaman He claims that based on perception and reaction time, Collins had to have been 532' east of the collision when it occurred therefore he couldn't have seen what he claims he saw. Bartlett does not offer any criticism of Teaman's testimony.

2. Mr. Roger Allen – DOT. As is typical for Allen, he goes way beyond his expertise and opines that our driver crossed the center line despite Allen not being a reconstruction expert. He lodges unfounded claims that Dillon did poor route planning by sending trucks on this narrow two lane roadway, Dillon did a poor job of post accident investigation by not requiring our driver to do post accident drug and alcohol testing (although admittedly not required by DOT and our driver did his own later that day), Dillon should have done a post accident interview of the driver, our driver failed to fill out an accident kit, failed to put out post accident triangles. Although none of these items were pre accident Allen claims they reflect a culture that is not geared toward safety. Lastly, Allen claims our driver should have driven into the ditch to avoid this accident.

3. Dr. Haskel Hoine – Neuropsychologist – Miguel Garcia suffered a concussion and has chronic pain syndrome. Garcia had a Glasgow Coma Scale of 12-14 and has confused memory of the accident. He admits there was a normal brain

Mr. Ken Pixley
September 14, 2015
Page 5

    CT scan. He claims that the concussion will even more limit Garcia's already limited intellectual abilities and consequently can not learn new trades.

4. Donna Johnson – Vocational Rehabilitation: Based on Dr. Hoine's opinions Ms. Johnson says that Garcia is totally disabled from work.
5. Miguel Garcia past medical is $263,587.43.
6. Betty Wintroath- life care planner – Future medical for Garcia is $1,319,998.
7. Robert Johnson – economist – Loss of earning capacity for Garcia- $721,807
8. Teresa Gamez past medical - $20,083.60
9. Everett Dillman – economist for Teresa Gamez – past lost earnings - $64,211; future lost earning capacity- $930,537
10. Dr. Angel Roman – life care plan Teresa Gamez - $2,465,591
11. Dr. Randall Benson – Neurologist – Teresa Gamez suffered a traumatic brain injury with binocular vision problems
12. Dr. Haskel Honie – neuropsychologist- Teresa Gamez suffered a Traumatic Brain Injury affecting her verbal, executive, and memory skills.

## VIII. Report on Depositions

### A. Kenneth Eugene Jennings:

Mr. Jennings was deposed on October 23, 2013 and made an excellent witness appearance. He is a 50 year old African American who is soft spoken and sincere. I believe that a jury will find him credible and likeable.

    Jennings testified that on Saturday March 2, 2013 he began his morning in Beeville, Texas after having spent a 9 hour break in the sleeper. He then drove off and on for four hours that day hauling loads around Beeville, Port Aransas, Kennedy, and Sinton, Texas. He had taken his lunch break and left Port Aransas around 2:20PM to drive back toward San Antonio. Jennings chose to drive up US Highway 181 to Sinton and was intending on following State Highway 188 out of Sinton and to IH-37 to follow up to San Antonio. The route Jennings selected is the most direct route but does encompass approximately 17 miles of driving on State Highway 188 which is basically a 2 lane Farm Market Road with no shoulders. Plaintiff's counsel was critical of Jennings selection stating that it was safer to do the harbor bridge through Corpus Christi where you have divided highways all the way. There is no signage prohibiting truck traffic on 188.

    Jennings stated that he was travelling below the speed limit at all times. He described Highway 188 as being very narrow two lane roadway with no shoulder. He testified that the speed limit was 55 MPH and that he was doing under the speed limit as he approached a leftward curve in the roadway. In fact he stated that he was slowing for this curve. Jennings described the accident happening just as the curve began for his direction of travel. Jennings had slowed to 35 to 40 mph for the curve and saw an east bound motorcycle coming around the curve and driving on the yellow dividing lanes. Jennings

Mr. Ken Pixley
September 14, 2015
Page 6

tried to pull his tractor as far to the right as he could but due to the fact there are no shoulders Jennings could not move far.

Jennings observed the motorcycle as it passed his cab and then heard a tick towards the back of his trailer. Jennings looked in his driver's mirror and saw the motorcycle out of control. Jennings pulled his tractor down the road to where he could park on the dirt shoulder and got out to check on the motorcyclists. By this point the motorcyclist were surrounded by passersby and EMS had been called.

Jennings stayed with his tractor and reported the accident as described above to the State Trooper. He also called Noel at Dillon's San Antonio office and spoke with Jeff Parker in Florida. Jennings did not fill out an accident kit but did take photographs of the scene. Jennings recalls having talked to a witness who was following the motorcycle and saw the wreck, but that witness did not say who crossed the center stripe.

Ultimately, DPS released Jennings and Jennings drove over to IH-37 where he stopped to regain his composure. Jennings admitted to talking with some unknown trucker at the truck stop.

Jennings left the truck stop and stayed that night just southeast of San Antonio. Plaintiff tried to get Jennings to testify that he told our investigator, Doug Coutour, that the accident was his entire fault. Jennings denied this statement. Jennings was very firm with plaintiff's counsel in denying this admission. Jennings further emphasized that his trailer tires never crossed the center stripe.

Jennings has a very good driving history and driving file. He has had no tickets in the last three years and has had no motor vehicle accidents. He did have two very minor incidents while employed at Dillon. The first being a minor product spill and the second being a minor one vehicle accident in which he drove over a culvert and did some undercarriage damage to his tractor.

Because the accident did not involve a citation Jennings was not asked to do drug and alcohol testing. However, Jennings got nervous and the next day did his own testing at an Austin facility. The results were produced and were negative. Jennings further testified he was not on the cell phone at the time of the accident and his records support this statement.

### B. Trooper Cody Lankford

Trooper Lankford is a 10 year veteran of the Texas Department of Public Safety and was deposed on October 25. Plaintiff's primary focus was to get the officer to admit that there were conflicting witnesses regarding who crossed the centerline. Plaintiff's counsel played the DPS police dash cam which had garbled statements from various people at the scene. One was of Deputy Emma Burleson who is quoted as saying that someone said the tractor

{03556123.DOC / }

Mr. Ken Pixley
September 14, 2015
Page 7

crossed the center line. (Burleson was deposed later and clarified that someone was Mr. Garcia.) The other witness was Collins saying the motorcycle crossed the center line.

As a result of this conflicting "statements" Lankford chose to ignore the witness and go only with the physical evidence. Lankford then described the physical evidence of plaintiff motorcycle sideswiping the left rear of our trailer. He further described the gouge mark from the motorcycle which started on Dillon's side of the road way and went back into the motorcycle side and further east from the impact area. Based no these gouge marks the officer concluded that the impact occurred on Dillon's side of the center stripe.

It is important to note that Trooper Lankford has been through all 6 levels of accident reconstruction schools with the State of Texas. Trooper Lankford's ultimate conclusion was that the motorcycle crossed into Dillon's lane of travel and the impact occurred in the Dillon lane. This opinion was primarily based upon the field of debris by the accident and the gouge marks. Trooper Lankford spray painted the roadway showing the first gouge mark from the motorcycle approximately four inches into our tractor's lane of travel. Lankford also testified that he did not issue a ticket to Garcia because Garcia had already suffered enough from having his "body destroyed, bike destroyed, and friend's body destroyed". He does not believe in punishing a person when they are down.

Trooper Lankford will make a strong and credible witness for the defense.

### C. Deputy Emma Burleson

Emma Burleson is a San Patricio County Sheriff's Deputy who reported to the accident scene. She was deposed on October 28th. Her primary job was to coordinate the transfer of patients to med evac and ambulance care. She testified that she did report Miguel Garcia's scene statement that the tractor trailer crossed the center stripe. Her testimony helped clarify the scene confusion wherein people believed there were eyewitnesses testifying to both vehicles crossing the center stripe. Now it appears the only scene witness to testify the Tractor crossed the center stripe was Miguel Garcia whereas there is an independent witness to testify that Garcia crossed the center stripe. Burleson admitted that she did not interview Jennings and did no reconstruction of the accident.

### D. Allen Wells Christus Spohn Hospital Lab Director

Allen Wells was deposed on October 28th by plaintiff for one purpose and that was to eliminate the serum alcohol report. Very simply placed, Wells testified that the positive serum alcohol report for Miguel Garcia was insignificant. He stated that the lowest possible positive test result was less than 10 mg/dl and that was the score for Garcia. He translated this result to mean that Garcia had less than .01 concentrate of alcohol in his blood which is less than 1/8 of the legal limit. The effect of this deposition is that it is unlikely Garcia was impaired by alcohol and it is most likely no evidence of alcohol will be admitted to the jury.

{03556123.DOC / }

Mr. Ken Pixley
September 14, 2015
Page 8

### E. Miguel Garcia

Miguel Garcia was deposed on November 1, 2013. He will make a fair witness. He appeared credible in all aspects of testimony until it came to the accident facts. At that point, he presented an extremely unbelievable version of the accident that would either be the result of a blatant lie or his suffering from shock and having a completely skewed version of the accident. Considering that he was coherent throughout the post accident scene experience and suffered no head injury, I suspect he is making up something to keep from having to tell the truth.

Miguel's version of the accident has him coming east on 188 in the middle of the east bound lane when he rounds this curve in the roadway and is confronted with a tractor-trailer straddling the entirety of the roadway. Miguel described the trailer as being perpendicular to Miguel's lane of travel. The tractor was turned as if it were pulling the trailer across the road with intention to turn left and go west.

Miguel stated that he slowed to 15 mph and motored over to the cab of the tractor to see what was going on and got no response. He then turned his motorcycle back toward the trailer to go around the back of the trailer. Suddenly the tractor driver gunned his engine and pulled the trailer hard forward and to the west and ran over Garcia. Rather incredible.

Garcia is a 50 year old man who graduated from Corpus Christ Moody High School and has lived in Corpus all his life. He was employed by ICI Services Corporation from 2005 until just recently when he was laid off due to inability to return to work post accident. Garcia was an auto worker and was making $16.98 per hour. He is not married but is now living with his girlfriend and co-plaintiff Theresa Gomez at her house. He claims to have had no other accidents or tickets in the last 10 years.

Miguel has had a motorcycle license since he was 22 years old. He claims that he drove his motorcycle daily and was very accustomed to its handling.

On Saturday March 2, 2013 Garcia and Theresa Gamez left with four friends for a motorcycle ride and a pulled pork cooking contest. He admitted to having one beer at the cook off around noon. They left the cook off and were traveling down 188 eastbound to Sinton. Ruben and Shirley Pena and Cynthia and Jesse Ybarra were ahead of him on 188. The three motorcyclists customarily rode in this order. Garcia admitted that none of the other four riders witnessed his accident.

Garcia testified that he was in shock after the accident and that he did not feel pain. He recalls the air transfer to Corpus Spohn Hospital and remembers challenging the doctors to save his leg. Despite the efforts of Spohn Hospital plaintiff lost his left leg approximately four inches below the knee.

{03556123.DOC / }

Mr. Ken Pixley
September 14, 2015
Page 9

Garcia testified to the following injuries.

1.   Below the knee amputation of left leg
2.   Amputation of left pinky
3.   Left hand damaged and limited motion
4.   Back hurting for a while but appears to be getting better.
5.   Right leg sometimes hurting while he develops strength to handle the amputation.

Garcia does want to return to work but feels he must undergo additional training for a new career.  He does take pain medicine once in the morning and once in the evening.   His medical has been paid by Blue Cross Blue Shield.  He describes his day as waking up and watching TV.  Interestingly, Garcia attended the deposition with a cane to assist him. However, when the deposition ended he stood and walked out of the room with out his cane.  Only after I pointed out that he had left it behind did he return with an exaggerated limp to retrieve the cane.

### F.   Theresa Gamez

Theresa Gamez did not make a very credible witness when she was deposed on November 1st.  She would repeat every question asked of her and look a little puzzled. Then she would repeat many of the questions once again.  It is either a ploy to allow her more time to assess the question or she truly has a significant brain injury.

Theresa's version of the accident is equally non credible as that of Miguel.  She testified that they were traveling down 188 when suddenly "a white tractor was in her face, like it was going to tear her face off, she looked down and saw that they were on their side of the center stripe, then all else went blank and she awoke in a hospital".  That is the extent of her accident testimony.

Theresa is a 1984 graduate of Eastern New Mexico University and is working as an All State Insurance agent.  She has maintained this job since 1997.  She has returned to work but on a 32 hour a week schedule.  She is paid a base salary and a bonus based on production.

She claims the following injuries;
1.   Brain injury which she describes as mush and that it doesn't work right.
2.   Lung bruise which has healed
3.   Rib fracture which has healed
4.   Left clavicle fracture which has healed
5.   Bruising which has healed.

She is also claiming that her back and legs are hurting.

{03556123.DOC / }

Mr. Ken Pixley
September 14, 2015
Page 10

Theresa agrees that their four motorcycle friends did not witness the accident and she knows of no witnesses other than the three individuals involved. Theresa also testified that her medical has been paid by Humana Insurance.

### G. Jeff Parker

Jeff Parker was deposed on November 8, 2013 and made a very good witness. Jeff is the Director of Safety for Dillon Transport. He was very calm and sincere in his presentation. Plaintiffs' counsel had a very disjointed examination of Jeff. It seemed as if plaintiffs' counsel knew there just wasn't much to attack on our driver's background and on the company's training program. Instead, the counsel seemed more intent to try and establish that the route chosen by Kenneth Jennings that day should never have been chosen and that Dillon should not allow its driver's to travel on narrow two lane roadways.

The most concerning aspect of the deposition occurred late when plaintiffs' counsel sprung a video of a Dillon tractor-trailer driving through the same curve as the accident and that driver cutting the corner such that the tractor and trailer went all the way into oncoming traffic. This video was taken March 19, after the accident and we have the trailer number and have identified that driver, Daniel Castillo. Interestingly, Dillon fired Castillo on March 22nd for unsafe driving practices. I will contact Castillo to discuss whether he was paid to perform the driving maneuver reflected in the video. I have concern that he may have been paid to do this maneuver because the video shows him pulling over to the side of the road after completing the maneuver and then the video goes blank.

Jeff further testified that the company will do Root Cause Analysis on its accidents but has not done so in this case due to litigation. He testified that based on what he has seen in this accident to date that his driver was not negligent and that this accident was non preventable on the part of Dillon.

Jeff was unaware that our driver had done his own drug/alcohol testing. Jeff testified that such testing was not required in this instance because no citation was issued at the scene.

### H. Randy Collins Jr. and Randy Collins III

Eyewitness Randy Collins Jr. and III were following our tractor and gave testimony that they had been following our trailer for 5 – 6 miles and the accident occurred just before the leftward curve began. They stated that our driver was traveling 55 – 60 MPH and that as our tractor trailer approached the curve our trailer tires were always to the west bound side of our no passing stripe. They stated that they could not state whether our trailer body was over the no passing stripe, but definitely our tires never crossed our no passing stripe. It will be important for our reconstruction expert to show that the outside of the trailer tires correspond with the outer edge of our trailer and therefore there is a physical impossibility for the trailer to have crossed our no passing line. The Collins then reported seeing a cloud

{03556123.DOC / }

Mr. Ken Pixley
September 14, 2015
Page 11

of debris explode at the left rear of our trailer and then observed a motorcycle wobble out o
the explosion.

### I. Charlie Teaman

Teaman was following the Garcia motorcycle at the time of the accident. His deposition
testimony was particularly strong for us. He testified that the motorcycle drifting over to and
clipped our trailer in our lane of travel when the motorcycle crossed both solid yellow lines
dividing the roadway. He further stated our driver never left his side of the roadway.

### J. Motorcycle co riders

We deposed the four co riders with Garcia and Gamez on the day of the accident. None
were eyewitnesses to the accident as they were traveling a couple of miles ahead of
Garcia. These witnesses are Mr. and Ms. Pena and Mr. and Mrs. Ybarra. There testimony
should have no bearing on the liability in the case. On the other hand, they did confirm that
Garcia did have one beer earlier in the day, however stated that he was not impaired.

### K. Raquel Esparza and Mike Garcia Jr.

Mike Jr is Garcia's son and Raquel is Mike Jr's girlfriend. Their sole purpose in the case
was to testify that our investigator, Doug Coutour, came by Mike's house several months
after the fact to check on Mike. They claim that Doug relayed to them that our driver had
admitted to him that the accident was Jennings fault. The words were "Jennings is sorry for
what he caused". On cross examination Raquel admitted that the statement may have
been I am sorry that Mike was in an accident as opposed to a fault statement.

I have spoken with Doug Coutour who has flatly denied making such statements. We will
need to brief this issue and move to exclude this testimony. Plaintiffs will argue that the
alleged statement of Jennings on fault is an admission by party opponent and therefore not
hearsay. They will then allege that Coutour was Jennings agent and therefore his
statement is likewise and admission by party opponent. We will need to show that Coutour
was not Jennings agent.

## IX. Medical

### A. Theresa A. Gamez

Theresa A. Gamez was born on December 1, 1964. Her medical summary is as
follows:

Ms. Gamez was treated at the scene of the accident by Sinton Emergency Medical
Service. They diagnosed her with a positive loss of consciousness and complaints of neck

{03556123.DOC / }

Mr. Ken Pixley
September 14, 2015
Page 12

and back pain. She was transported to Christus Spohn Hospital in Corpus Christi, Texas. Upon arrival on March 2, Theresa Gamez was diagnosed with the following:

1. Left clavicle fracture.
2. Fourth left rib fracture
3. Small subarachnoid hemorrhage with left cerebral contusion.

Ms. Gamez was treated at Christus Spohn Hospital from March 2, 2013 and discharged on March 5, 2013 having recovered from the subarachnoid hemorrhage and being treated conservatively for the rib and clavicle fractures.

She was readmitted on March 6, 2013 with complaints of vaginal bleeding. She was diagnosed with a urinary and vaginal infection.

Thereafter her treatment is by retained experts listed above.

Theresa's medical bills total $20,083.60.

**B.     Miguel Garcia**

Miguel Garcia was born on September 14, 1963.   His medical summary is as follows:

On March 2, 2013 Halo flight was dispatch to pick Miguel Garcia up from the scene of the accident.   They arrived at the scene at 3:22 and life-flighted Miguel Garcia to Christus Spohn Hospital. Prior to the life flight, Sinton EMS had transported Miguel from the accident scene to the airport in Sinton, Texas.  Sinton EMS reports Miguel as denying loss of consciousness and contending that he had had no drug or alcohol.  Halo Flight noted that Miguel Garcia's height was 6ft 2in and his weight 225lbs. They noted also that is Glasgow Coma Scale was 14 and the Revised Trauma Scale was 12.  They diagnosed a dislocation fracture of the lower left extremity and described it as being mangled. They also described a partial amputation of the left pinky.

Miguel Garcia arrived at Christus Spohn Hospital on March 2, 2013.  He was transported into the emergency room and a blood draw was conducted at 4 o'clock.  The result of the blood draw was positive for alcohol however, the positive finding was less than .01.  Perhaps one hour earlier at the time of the accident his blood alcohol level would have been .02 or only ¼ the legal limit.  Miguel admitted to having consumed three (3) beers earlier in the day.

Miguel Garcia was treated at Christus Spohn Hospital from March 2, 2013 through March 9, 2013.  The primary treatment was an effort to save the lower left leg.  He was diagnosed with an open tibia fibula fracture and extensive soft tissue damage and muscle

{03556123.DOC / }

Mr. Ken Pixley
September 14, 2015
Page 13

loss. He also suffered a left calcaneus fracture. On the hand, Garcia suffered from a fifth, third and fourth metacarpal fracture and a fifth Phalanx fracture.

Heroic efforts were made to salvage the lower left leg. By March 9, 2013 the leg had been reconstructed and Garcia was discharged to Houston Memorial Hospital for rehabilitation.

Thereafter his medical is by retained experts.

Miguel's medical totals $263,587.43.

.X.     Evaluation

At present the accident appears to be defensible. All evidence points to Garcia being the sole cause of the accident and that his negligence should easily exceed 50% thus barring any potential recovery on his part. His damages obviously are severe and would warrant a verdict in the neighborhood of $2,000,000. However, his negligence should bar any recovery by Garcia.

On the other hand, Ms. Gamez appears to be a negligent free plaintiff. Although we have filed a cross action against Garcia the risk for Dillon is that a jury places 80-90% fault on Garcia and 10-20% fault on our driver. If so, we would owe 10-20% of Ms. Gamez' damages. I estimated that a jury would award Ms. Gamez damages in the $500,000 range and assuming Dillon was 10 to 20% at fault for the accident Dillon's exposure would be in the $50,000 to $100,000 range.

It is obvious the plaintiff wants to get our driver over 50% responsible. He is going to attempt to do this in two manners.
1. He will attempt to show that our tractor crossed the center line and led to this accident;
2. He will attempt to show that the trailer will overlap the edge of the tires, therefore even if the tires are on our side of the road the trailer could still extend; and
3. He will try to build a case that Dillon should never let big rigs on small roads.

Plaintiffs' counsel is trying to build on anti big truck sentiment in the Eagle Ford Shale area to bias the jury. Every week the press has another story about big rigs tearing up the roadways and causing injury and death. The press never reveals that the vast majority of the accidents are due to the fault of the smaller vehicle, consequently the area surrounding this county has a pre set negative bias against trucking and particularly oil field trucking. We will need to build on Dillon's positive vehicle record and training program to negate this negative bias.

{03556123.DOC / }

Mr. Ken Pixley
September 14, 2015
Page 14


Given the evidence to date, I recommend settlement up to $100,000.


Please let me know if you have any questions or concerns.



Respectfully,

*Larry D. Warren*

Larry D. Warren


LDW/ldw


cc.     Jeff Dillon
        Daniel Traumiller claim no. 030-302030

*Original*

CAUSE NO. 2015DCV-0235-B

| THERESA GAMEZ | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| VS. | § | |
| | § | |
| DILLON TRANSPORT, INC.; | § | 117TH JUDICIAL DISTRICT |
| | § | |
| DILLON TRANSPORT, INC. IN ITS | § | |
| COMMON OR ASSUMED NAME; | § | |
| | § | |
| KENNETH EUGENE JENNINGS; | § | |
| | § | |
| AND | § | |
| | § | |
| MIGUEL A. GARCIA, SR. | § | |
| Defendants. | § | NUECES COUNTY, TEXAS |

---

**CHARGE OF THE COURT**

---

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any

SCANNED

DEC 21 2015

ANNE LORENTZEN DISTRICT CLERK
NUECES COUNTY

1

FILED

DEC 16 2015

ANNE LORENTZEN, CLERK
COUNTY & DISTRICT COURTS NUECES COUNTY TEXAS
BY_____DEPUTY

EXHIBIT
2

special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions.

1.    Do not let bias, prejudice or sympathy play any part in your decision.

2.    Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not admitted in the courtroom.

3.    You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

2

4.     If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.     All the questions and answers are important. No one should say that any question or answer is not important.

6.     Answer "yes" or "no" to all questions unless you are told otherwise. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no", your answer must be based on a preponderance of the evidence.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "yes" answer, then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7.     Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.     Do not answer questions by drawing straws or by any method of chance.

3

9.      Some questions might ask you for a dollar amount.  Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.      Do not trade your answers.  For example, do not say, "I will answer this question your way if you answer another question my way."

11.      The answers to the questions must be based on the decision of at least 10 of the 12 jurors.  The same 10 jurors must agree on every answer.  Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial.  If a juror breaks any of these rules, tell that person to stop and report it to me, immediately.

4

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using *ordinary care* would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

5

# QUESTION NO. 1

Did the negligence, if any, of those named below proximately cause the occurrence in question?

Answer "Yes" or "No" for each of the following:

Answer the question as to Dillon Transport, Inc. only if you have answered "Yes" as to Kenneth Eugene Jennings.

a.  Kenneth Eugene Jennings          Yes

b.  Dillon Transport, Inc.           Yes

c.  Miguel A. Garcia, Sr.            Yes

6

If you answered "Yes" to Question No. 1 for more than one of those named below, then answer the following question. Otherwise, do not answer the following question.

Assign percentages of responsibility only to those you found caused or contributed to cause the occurrence in question. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

## QUESTION NO. 2

For each person you found caused or contributed to cause the occurrence in question, find the percentage of responsibility attributable to each:

|   |   |   |   |
|---|---|---|---|
| a. | Kenneth Eugene Jennings | 20 | % |
| b. | Dillon Transport, Inc. | 60 | % |
| c. | Miguel A. Garcia, Sr. | 20 | % |
|   | Total | 100 | % |

7

Answer Question No. 3 if you answered "Yes" for any one or more of the Defendants Dillon Transport, Inc. and/or Kenneth Eugene Jennings and/or Miguel A. Garcia, Sr. to Question No. 1.

Otherwise, do not answer Question No. 3.

### QUESTION NO. 3

What sum of money, if paid now in cash, would fairly and reasonably compensate Theresa A. Gamez for her injuries, if any, that resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately in dollars and cents for damages, if any.

a.  Physical pain and mental anguish sustained in the past.

Answer: $ ____150,000____

b.  Physical pain and mental anguish that, in reasonable probability, Theresa A. Gamez will sustain in the future.

Answer: $ ____150,000____

c.  Loss of earning capacity that, in reasonable probability, Theresa A. Gamez will sustain in the future.

Answer: $ ____534,160____

d.  Physical impairment, including but not limited to loss of enjoyment of life, that Theresa A. Gamez has sustained in the past.

Answer: $ ____150,000____

8

e.  Physical impairment, including but not limited to loss of enjoyment of life that, in reasonable probability Theresa A. Gamez will sustain in the future.

Answer: $ ___3 million___

f.  Medical care expenses sustained in the past.

Answer: $ ___70,634.40___

g.  Medical care expenses that, in reasonable probability, Theresa A. Gamez will sustain in the future.

Answer: $ ___1.5 million___

9

Answer Question No. 4 if you answered "Yes" for any one or more of the Defendants Dillon Transport, Inc. and/or Kenneth Eugene Jennings to Question No. 1 and answered 50 percent or less for Miguel A. Garcia, Sr. to Question No. 2(c).

Otherwise, do not answer Question No. 4.

### QUESTION NO. 4

What sum of money, if paid now in cash, would fairly and reasonably compensate Miguel A. Garcia, Sr. for his injuries, if any, that resulted from the occurrence in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately in dollars and cents for damages, if any. Do not reduce the amounts, if any, in your answers because of the negligence, if any, of Miguel A. Garcia, Sr. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

a. Physical pain and mental anguish sustained in the past.

   Answer: $ _____ 2 mil.

b. Physical pain and mental anguish that, in reasonable probability, Miguel A. Garcia, Sr. will sustain in the future.

   Answer: $ _____ 7 million

c. Lost earnings sustained in the past.

   Answer: $ _____ 152,000

d. Loss of earning capacity that, in reasonable probability, Miguel A. Garcia, Sr. will sustain in the future.

   Answer: $ _____ 760,000

10

e.  Disfigurement sustained in the past.

Answer: $ _____ 200,000 _____

f.  Disfigurement that, in reasonable probability, Miguel A. Garcia, Sr. will sustain in the future.

Answer: $ _____ 800,000 _____

g.  Physical impairment, including but not limited to loss of enjoyment of life, that Miguel A. Garcia, Sr. has sustained in the past.

Answer: $ _____ 1 million _____

h.  Physical impairment, including but not limited to loss of enjoyment of life that, in reasonable probability Miguel A. Garcia, Sr. will sustain in the future.

Answer: $ _____ 10 million _____

i.  Medical care expenses sustained in the past.

Answer: $ _____ 264,842.71 _____

j.  Medical care expenses that, in reasonable probability, Miguel A. Garcia, Sr. will sustain in the future.

Answer: $ _____ 3 million _____

11

Answer the following question regarding Dillon Transport, Inc. only if you unanimously answered "Yes" to Question No. 1 regarding Dillon Transport, Inc. Otherwise, do not answer the following question regarding Dillon Transport, Inc.

To answer "Yes" to the following question, your answer must be unanimous. You may answer "No" to the following question only upon a vote of ten or more jurors. Otherwise, you must answer the following question.

## QUESTION NO. 5

Do you find by clear and convincing evidence that the harm to Theresa A. Gamez and/or Miguel A. Garcia, Sr. resulted from gross negligence?

"Clear and convincing evidence" means the measure or degree of proof that produces a firm belief or conviction of the truth of the allegations sought to be established.

"Gross negligence" means an act or omission by Dillon Transport, Inc.,

1.  which when viewed objectively from the standpoint of Dillon Transport, Inc. at the time of the occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

2.  of which Dillon Transport, Inc. has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Answer "Yes" or "No"

Answer: _____

12

Answer the following question regarding Dillon Transport, Inc. only if you unanimously answered "Yes" to Question No. 5 regarding Dillon Transport, Inc. Otherwise, do not answer the following question regarding Dillon Transport, Inc.

## QUESTION NO. 6

You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, should be assessed against Dillon Transport, Inc. and awarded to Theresa A. Gamez as exemplary damages for the conduct found in response to Question No. 5.

"Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages includes punitive damages.

Factors to consider in awarding exemplary damages, if any, are :—

1.    The nature of the wrong.

2.    The character of the conduct involved.

3.    The degree of culpability of the wrongdoer.

4.    The situation and sensibilities of the parties concerned.

5.    The extent to which such conduct offends a public sense of justice and propriety.

Answer in dollars and cents, if any.

Answer: $ _____

13

Answer the following question regarding Dillon Transport, Inc. only if you unanimously answered "Yes" to Question No. 5 regarding Dillon Transport, Inc. Otherwise, do not answer the following question regarding Dillon Transport, Inc.

## QUESTION NO. 7

You are instructed that you must unanimously agree on the amount of any award of exemplary damages.

What sum of money, if any, should be assessed against Dillon Transport, Inc. and awarded to Miguel A. Garcia, Sr. as exemplary damages for the conduct found in response to Question No. 5.

"Exemplary damages" means any damages awarded as a penalty or by way of punishment but not for compensatory purposes. Exemplary damages includes punitive damages.

Factors to consider in awarding exemplary damages, if any, are —

1.    The nature of the wrong.

2.    The character of the conduct involved.

3.    The degree of culpability of the wrongdoer.

4.    The situation and sensibilities of the parties concerned.

5.    The extent to which such conduct offends a public sense of justice and propriety.

Answer in dollars and cents, if any.

Answer: $_____

14

**Presiding Juror:**

1.    When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2.    The presiding juror has these duties:

    a.    have the complete charge read aloud if it will be helpful to your deliberations;

    b.    preside over your deliberations, meaning manage the discussions, and see that you follow these instructions;

    c.    give written questions or comments to the bailiff who will give them to the judge;

    d.    write down the answers you agree on;

    e.    get the signatures for the verdict certificate; and

    f.    notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

**Instructions for Signing the Verdict Certificate:**

1.    You may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2.    If 10 jurors agree on every answer, those 10 jurors sign the verdict.

If 11 jurors agree on every answer, those 11 jurors sign the verdict.

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.    All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

15

Do you understand these instructions? If you not, please tell me now.

_____
JUDGE PRESIDING
12/16/15

**Verdict Certificate**

Check one:

_____ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_____        _____
Signature of Presiding Juror        Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

___✓____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

SIGNATURE                           NAME PRINTED

1._____        Lori Edwards

2._____        Christine M. Sherry

16

3. _David Rios SR_     DAVid LiAS sR

4. _Diane J Bailey_     DIANE J. BAILEY

5. _Gato S. Ryp III_     Gonzalo S. Reyes III

6. _Sheila Jenkins_     Sheila Jenkins

7. _Guadalupe G Vasquez_     Guadalupe G Vasquez

8. _Vivian L Brown_     Vivian L Brown

9. _Carolyn Molina_     Carolyn Molina

10. _____     Roel PALACiOS JR.

11. _____     _____

17